# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

REINHART BOERNER VAN DUREN S.C.,

        **Third-Party Plaintiff,**

**and**

**CHICAGO TITLE INSURANCE COMPANY,**        Case No. 10-C-753

        **Cross-Claimant.**

**v.**

**CARL JOHAN FREER,**

        **Third-Party Defendant-Cross-Claim Defendant.**

---

## DECISION AND ORDER

---

This Decision and Order addresses the motions for summary judgment filed by Chicago Title Insurance Company ("Chicago Title"), and Carl Johan Freer ("Freer"), and the partial summary judgment motion filed by Reinhart Boerner Van Duren S.C. ("Reinhart").

### Factual and Procedural Background

The factual and procedural background provides context for analysis of the pending motions.  In January 2007, Plaintiff Timor Mohamed ("Mohamed") loaned $1 million to Blowfish Works ("Blowfish"), Freer's company.  Freer provided a personal guarantee for the loan to Blowfish.

A Short Form Deed of Trust ("Deed of Trust") for the residence located at 1744 Stone Canyon Road, Los Angeles, California (the "California home" or the

"California residence") owned by Freer and his then-wife Anneli Freer ("Anneli") (collectively the "Freers"),[1] was to have secured the promissory note ("Blowfish Note") for the loan. Reinhart, counsel for Mohamed, requested that Chicago Title record a deed of trust. The deed of trust was not recorded. In August 2007, the Freers sold their California home. Mohamed had no secured interest in the home. Neither Blowfish nor Freer (as guarantor of the Blowfish Note) has repaid the principal or interest on the $1 million loan.

On September 1, 2010, Mohamed filed this action. Mohamed's Amended Complaint alleged claims for breach of fiduciary duty, negligence, and breach of contract against Chicago Title. (ECF No. 66.) Mohamed also made claims against Reinhart for legal malpractice, breach of fiduciary duty, equitable estoppel, intentional misrepresentation, and principal and agent liability.

Reinhart and Chicago Title filed cross-claims against each other. (ECF Nos. 69 & 78.) Reinhart cross-claimed for contribution and indemnification (first cross-claim), and that Chicago Title breached its duty to Reinhart (second cross-claim). Chicago Title cross-claimed for indemnification and contribution from Reinhart.

Reinhart filed a third-party Complaint against Freer for indemnification and subrogation. (ECF No. 104.) Chicago Title filed cross-claims against Freer for contribution and indemnification and for subrogation. (ECF No. 106.)

---

[1] The Court departs from its usual practice of referring to individuals by their surnames to distinguish between the Freers. No disrespect is intended.

On March 27, 2013, the Court approved a stipulation dismissing Mohamed's claims against Reinhart. (ECF No. 129.) Mohamed assigned his claims against Chicago Title in this action to Reinhart. However, for the purposes of this Decision and Order, the Court will continue to refer to the assigned claims as Mohamed's claims.

Thereafter, pursuant to a May 14, 2013, Order, Chicago Title filed a sur-reply and Reinhart filed a short response to that sur-reply brief. (ECF Nos. 165, 166, 169.) Those additional briefs address the impact of the settlement between Reinhart and Mohamed on the claims in this action.

On June 20, 2013, Reinhart and Chicago Title advised the Court that they settled all claims and cross-claims between them, including those claims that Reinhart held as assignee of Mohamed. Thus, Chicago Title's motion for summary judgment with respect to Reinhart and its assigned claims of Mohamed is moot, as is Reinhart's motion for partial summary judgment with respect to Chicago Title's claims. Those portions of their motions are dismissed as moot.

Chicago Title's cross-claims against Freer remain pending, as does Reinhart's third-party Complaint. Thus the portions of the pending summary judgment motions and partial summary judgment motions will be addressed. However, the Court needs to clarify the basis for its exercise of subject matter jurisdiction over the remaining claims in this action.

## SUBJECT MATTER JURISDICTION

- 3 -

Subject matter jurisdiction over Mohamed's action was based on 28 U.S.C. § 1332(a)(2), which affords jurisdiction over actions between citizens of different states and citizens of foreign states where the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue over the action was afforded by 28 U.S.C. § 1361.

Jurisdiction over the third-party Complaint is predicated on 28 U.S.C. § 1332(a)(2) and § 1332(a)(3) and 28 U.S.C.§ 1367(a). (*See* Am. third-party Compl. & Ans. Am. third-party Compl. ¶¶ 1& 2, 10-11.) (ECF Nos. 104 & 105.) Reinhart, a citizen of Wisconsin, alleges that Freer is citizen of Sweden and a permanent resident of the United States who was domiciled in California when the third-party Complaint was filed. (*Id*. at ¶ 2.) Freer agrees that he is a citizen of Sweden but denies that he is a permanent resident of the United States and that he was domiciled in California. (*Id.*)

Although Freer agrees that the Court has subject matter jurisdiction, parties cannot vest a federal court with subject matter jurisdiction by agreement. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). As the third-party Plaintiff Reinhart has the burden of establishing subject matter jurisdiction over the third-party Complaint, and at this time its allegations are controverted. *Travelers Prop. Cas. v. Good,* 689 F.3d 714, 722 (7th Cir. 2012). If Freer is a citizen of Sweden, and not a permanent resident, alienage jurisdiction would be afforded by § 1332(a)(2). Even if Freer is a permanent resident of California and a

- 4 -

citizen of Sweden, the Court would have jurisdiction under § 1332(a)(2), because there is no indication that Freer is citizen of Wisconsin.

In addition, Reinhart alleges that the Court has supplemental jurisdiction over the claims as afforded by 28 U.S.C. § 1367 because Reinhart's claim against Freer form part of the same case or controversy as Mohamed's action against Reinhart in that they derive from the same nucleus of operative facts. Even if the third-party Complaint were not supported by an independent jurisdictional basis, the Court may exercise supplemental jurisdiction over the third-party Complaint and cross-claims.

Furthermore, although the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits, *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251 (7th Cir.1994), the remaining claims fall into one of the three generally recognized exceptions to the general rule. *Wright* recognized the exception where "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." 29 F.3d at 1251 (quoting *Graf v. Elgin, Joliet & E. Ry. Co.*, 790 F.2d 1341, 1347-48 (7th Cir. 1986)).

That is the case here. The Court has devoted substantial resources to consideration of the parties' claims on summary judgment and to the resolution of numerous motions that preceded those motions. The action has a firm July 29, 2013, trial date for claims relating to events of 2007. "[S]ending the case to another court

- 5 -

will cause a substantial duplication of effort" and not be an efficient use of judicial resources. *See Miller Aviation v. Milwaukee Cnty. Bd. of Supervisors*, 273 F.3d 722, 731-32 (7th Cir. 2001).

## STANDARD FOR SUMMARY JUDGMENT

In resolving the pending motions, the Court applies the following standards. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment should be granted when a party that has had ample time for discovery fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. If the moving party establishes the absence of a genuine issue of material fact, the non-moving party must demonstrate that there is a genuine dispute over the material facts of the case. *Id.* at 323-24. "In determining whether a genuine issue of material fact exists, all facts are construed in favor of the nonmoving party." *Springer v. Durflinger,* 518 F.3d 479, 483-84 (7th Cir. 2008).

- 6 -

## Relevant Facts[2]

At all times relevant to this motion, Mohamed has been and is a citizen and resident of Barbados. Mohamed attended college in Florida and received a degree in engineering. He then obtained a masters' degree in finance from Florida International University. After a career as a professional cricket player, Mohamed became a successful businessman in the shrimping industry. In 2000, Mohamed sold his shrimping business for $40 million.

In 2004, Reinhart, a Milwaukee, Wisconsin-based law firm, began representing Mohamed in connection with Mohamed's acquisition of Palmer Johnson, a Wisconsin yacht manufacturer that was in bankruptcy. Reinhart represented Mohamed during the time relevant to this litigation.

In performing services for Palmer Johnson and for Mohamed individually, Anthony J. Handzlik ("Handzlik"), a Reinhart attorney, worked almost exclusively

---

[2] The relevant facts are based upon the following, to the extent that they are undisputed: Chicago Title's proposed findings of fact ("PFOF") in support of its summary judgment motions and Reinhart's statement of additional facts ("SAF") (ECF Nos. 125 & 149); Reinhart's PFOF in support of its partial summary judgment motion and Chicago Title's additional statements of undisputed facts, (ECF Nos. 127 & 144); and factual statements proposed in conjunction with Freer's summary judgment motion. (ECF Nos. 139, 146, 154 & 155). Neither legal conclusions nor arguments are facts for the purposes of summary judgment and have been excluded from the relevant facts. Citations to all quoted excerpts are provided, regardless of whether they are undisputed.

Freer raises a "general objection" to all proposed factual findings asserting that he had "just recently" been made a party to the action and he did not take part in any depositions other than his own. (See e.g., Freer's Resp. Reinhart's SMF, 1-2.) (ECF No. 132.) Freer became a party on July 24, 2012, when he was served with a copy of Reinhart's third-party Complaint. The summary judgment motions were filed March 4, 2013. Between the date Freer was made a party and the deadline for filing dispositive motions, he did not request permission to conduct discovery, nor did he file a motion for relief under Rule 56(d) of the Federal Rules of Civil Procedure after the summary judgment and partial summary judgment motions were filed by Chicago Title and Reinhart. Freer has not raised a proper objection to the proposed factual findings.

- 7 -

through Michael Fleming ("Fleming"), an English businessman who was Mohamed's business representative and agent during the time relevant to this litigation. Reinhart was authorized to communicate and take instruction from Fleming on Mohamed's behalf.

After Mohamed acquired Palmer Johnson, Freer, whose current residence is disputed,[3] approached Palmer Johnson and Mohamed regarding the purchase of Cover Drive, a yacht owned by Mohamed. In 2005, Mohamed agreed to transfer Cover Drive to Freer in exchange for 600,000 shares in a company, Tiger Telematics, and a personal guarantee from Freer for $10.5 million. However, the shares and Freer's guarantee were worthless. In the fall of 2006, the $10.5 million debt remained outstanding. In December 2006, Freer refused to sign a note memorializing the debt.

In December 2006, upon learning that Mohamed was considering loaning additional funds to Freer or a Freer business, Handzlik began investigating Freer's background and obtained information that placed him on heightened alert. Handzlik ascertained that Freer was in the process of divorcing Anneli, suspected Freer of forgery, and thought Freer was a crook.

In a December 1, 2006, email, Fleming asked Handzlik to search for liens on the Freers' California residence. On December 4, 2006, Merlene DeZur ("DeZur"), a paralegal in Reinhart's real estate department, sent an email to Robert Morell

---

[3] Freer disputes the location of his current residence. (*See* Freer's Resp. to Chicago Title' PFOF ¶ 4.) (ECF No. 134.)

("Morrell"), a sales representative at the Waukesha, Wisconsin office of Chicago Title, a title insurance underwriter. De Zur requested a "letter report" on the Freers' residence to identify all monetary encumbrances on the property. Morrell forwarded the request to Sharon Buscher-Tuttle, ("Buscher-Tuttle") who worked in the national business unit of Chicago Title's office in Waukesha.

Chicago Title had national business units located across the country. Those units handled requests for assistance between Chicago Title offices in other cities and states. The Waukesha National Business Unit was tasked with coordinating commercial transactions for customers that involved property located outside of Milwaukee and Waukesha Counties. For many years before DeZur's December 2006, request Chicago Title had performed services for Reinhart's clients, including title searches on real property and recording mortgages and other documents.

Buscher-Tuttle sent Reinhart's request for a letter report to Rodney Huddleston ("Huddleston"), a vice president and operations manager in Chicago Title's Los Angeles, California office, who ran the office's national business unit. Buscher-Tuttle's request ultimately reached the unit of Clark McKinnon ("McKinnon"), a senior title officer in the Los Angeles office. Buscher-Tuttle's request for assistance from Chicago Title's Los Angeles office was a routine inter-office transaction. At the time, McKinnon's team of three or four employees was receiving hundreds, and sometimes thousands, of requests for assistance with property each month.

On December 6, 2006, McKinnon's secretary emailed Buscher-Tuttle

informing her that an order number for the letter report had been assigned for tracking and billing purposes, and that there would be a $500 charge for the letter report. Chicago Title opened a file for the assignment and generated several standard documents for the purposes of tracking the status of the order and billing for its services, including a title worksheet, a billing memo and a sub-escrow worksheet.

On December 11, 2006, the Los Angeles office prepared the letter report and sent it to Buscher-Tuttle. On December 11, Buscher-Tuttle forwarded the letter report via email to DeZur and informed DeZur that she would prepare an invoice and send it over shortly. Subsequently, Chicago Title sent a $25 invoice to Reinhart for the letter report. Reinhart paid the invoice by a check dated December 15, 2006.

On December 12, 2006, Handzlik informed Fleming that the letter report from Chicago Title disclosed the existence of two mortgages on the Freer residence, a $3.43 million deed of trust to Northern Trust Bank (the "Northern Trust mortgage") and a $501,000 deed of trust to a law firm (the "Law Firm mortgage"). Reinhart advised Mohamed, through Fleming, against having any further dealings with Freer because of the prior $10.5 million debt and other negative information about Freer's reputation.

Despite this advice, Mohamed agreed to loan funds to Freer's new company, Blowfish, in the hope that it would become profitable and enable Freer to repay the outstanding $10.5 million debt. To minimize the risk of nonpayment, Mohamed and Freer agreed to secure the Blowfish loan with an encumbrance on the Freers'

- 10 -

California home, owned by Freer and Anneli as joint tenants.

On January 10, 2007, Fleming sent an email to Handzlik stating that Freer was offering a "charge," or mortgage, on "his US property" in connection with his efforts to secure a loan from Mohamed. (Kennedy Aff. Opp'n Chicago Title's Mot. Summary J. ("Kennedy Opp'n Aff.")), Ex. G (email chain between Fleming & Handzlik); Ex. A (Fleming Dep.) 107:4-19.) (ECF No. 150, 150-7, 150-1.) Fleming inquired about the impact, under certain circumstances, "[i]f there are two parties ahead of us which make up the $3.9m[illion] charged so far and Freer gives us a $2m[illion] 'charge,' and whether Anneli would have to consent to the charge "and is [sic] so do you have a simple form I could have." (*Id.*, Ex. G.) The next day, January 11, 2007, Handzlik emailed Fleming that Anneli would have to "sign off" on the charge. (*Id.*, Ex. H.) (ECF No. 150-8.)

At 9:39 a.m. on January 12, 2007, Fleming sent an email to Handzlik stating that he had attached "a scan of the executed charge document," that would secure the loan to Blowfish. (*Id.*, Ex. I.) (ECF No. 150-9.) Fleming noted that Anneli had not signed the document, and again asked if her signature would be required. Fleming also stated that he intended to use a "secured Pro Note template" Handzlik had previously provided to prepare a promissory note that would reference "this charge" – i.e., the document securing the loan to Blowfish. (*Id.*) Fleming identified three of the documents that would memorialize the loan to Blowfish: "The basis of the charge will be a loan to Blowfish . . . [1] (Pro Note) with [2] a personal/directors guarantee from

- 11 -

Freer evidenced by the Pro Note and secured by way of the [3] charge." (*Id.*) Fourteen minutes after Fleming's email, Handzlik replied informing Fleming that no documents had been attached to his email. Two minutes later, at 9:55 a.m., Fleming sent Handzlik an email with scanned images of (1) a $2 million note signed only by Freer and (2) a Short Form Deed of Trust for Freers' California home, referencing a $2 million debt and also signed only by Freer. (*Id.*, Ex. B.) (ECF No. 150-2.) About 40 minutes later, Handzlik sent an email to Fleming advising him for the second time that Anneli's signature on the charge would probably be required.

On January 12, 2007, the Freers executed a "Note Secured by Deed of Trust" in the amount of $1 million to Mohamed. They also executed a Deed of Trust on their California home as security for their promissory note of the same date. The signatures of the Freers on the Deed of Trust were notarized on January 12, 2007, by Sarah Denise Daniels ("Daniels"), a notary public in Los Angeles County, California. The Deed of Trust specified the obligations that it secured:

> For the Purpose of Securing: 1. Performance of each agreement of Trustor incorporated by reference or contained herein. 2. Payment of the Indebtedness evidenced by one promissory note of even date herewith, and any extension or renewal thereof, in the principal sum of $1,000,000.00 executed by Trustor in favor of Beneficiary or order. 3. Payment of such further sums as the then record owner of said property hereafter may borrow from Beneficiary, when evidenced by another note (or notes) reciting it is so secured.

(Horne Decl., Ex. K.) (ECF No. 124-11.) The Deed of Trust states that the Freers are

- 12 -

the Trustor.[4]

On January 15, 2007, Mohamed, Blowfish, and Freer entered into a Short Term Loan Agreement (the "Agreement").[5] The Agreement states that Mohamed is the lender, Blowfish is the borrower, and Freer in his personal capacity is the guarantor. Freer, in his capacity as an officer of Blowfish, authorized Blowfish's borrowing of funds from Mohamed.

Under the Agreement, Mohamed agreed to loan Blowfish up to $1 million for business expenses. The Agreement stated that the funds loaned to Blowfish were to pay "valid business and loan repayments to the Guarantor." (Horne Decl., Ex. L, ¶ 3.2.) (ECF No. 124-12.) Specifically, the Agreement provided that $500,000 of the loaned funds were to be used to repay loans made by Freer to Blowfish.

Blowfish agreed to repay "all monies advanced by [Mohamed] together with any interest due" under the Agreement. (*Id.*, Ex. L, ¶ 4.1.) Section 6.1 of the Agreement, stated that Blowfish agreed to provide three documents in exchange for the funds loaned by Mohamed:

> Execute the Promissory Note [appendix 1]
>
> Provide a Directors [sic] Personal Guarantee from [Freer] [appendix 2]

---

[4] Freer agrees that Mohamed, or one of his agents, created that Deed of Trust that the Freers signed. (Freer's Resp. Chicago Title's PFOF ¶ 13.) (ECF No. 134.)

[5] Freer disputes paragraphs 33, and 37 through -41 of Reinhart's SMF, relating to the terms of the Agreement, Personal Guarantee, and Blowfish Note. (ECF No. 132.) The relevant facts reflect the Court's revisions of the proposed SMF to the extent that Freer's disputes are supported by the contents of the subject documents.

- 13 -

> Provide a duly executed Security Document in the form of
> a valid perfected 4th Charge on [the California residence].

(*Id.*, Ex. L, ¶ 6.1.)

Freer executed a "Personal Guarantee" in connection with the loan under which he agreed that the obligation to repay the funds loaned by Mohamed under the Agreement would become equally binding upon Blowfish and Freer upon maturity or default. (*Id.*, Ex. M.) The Personal Guarantee states that it is "supported by a valid secured charge" on the California home. (*Id.*)[6]

On January 15, 2007,[7] Blowfish executed the Blowfish Note payable to Mohamed.[8] The Blowfish Note required Freer to provide a "charge" in his capacity as the Guarantor and that the charge would "be registered in the sum of $2m (two million US dollars)." (*Id.*, Ex. N, ¶ 3.) (ECF No. 124-14.) The Agreement and the Blowfish Note refer only to Blowfish as the "borrower" of the money from Mohamed. Anneli did not sign any of the documents executed on January 15, 2007, related to the loan to Blowfish.

Reinhart was engaged to "coordinate the preparation of a mortgage" that would

---

[6]Chicago Title and Reinhart disputed whether the Deed of Trust dated January 12, 2007, signed by Freer and Anneli, secured the Blowfish loan. (*See* Chicago Title Resp. Reinhart SMF ¶ 42.) (ECF No. 143.) However, construction of the Deed of Trust is a question of law for the Court.

[7]The upper right corner of the note is dated January 15, 200**6**. Apparently the date is a typographical error.

[8]There was a dispute between Chicago Title and Reinhart regarding who drafted the note. (Reinhart Resp. Chicago Title PFOF and Reinhart's SAF ¶22.) (ECF No. 149.) The dispute is not material to the resolution of the issues presented by the pending motions. Freer admits that Reinhart drafted the note. (Freer's Resp. Chicago Title's PFOF ¶ 22.) (ECF No. 134.) Reinhart and Chicago Title also disagreed regarding on whose behalf Freer executed the Note. (Reinhart Resp. Chicago Title PFOF and Reinhart's SAF ¶18.) However, that determination is a question of law for the Court.

- 14 -

serve as security for the Blowfish Note. However, Reinhart did not prepare any such document. Reinhart reviewed a January 12, 2007, Deed of Trust.[9] On January 16, 2007, DeZur sent an email to Buscher-Tuttle requesting an updated letter report in light of the recent recording of a third mortgage on the California residence.

On January 18, 2007, Fleming sent an email to Handzlik attaching a copy of an executed Deed of Trust on the California home in favor of Mohamed. (Kennedy Aff. Supp. Reinhart Mot. Partial Summary J. ("Kennedy Aff."), Ex. B ("Handzlik Dep.") 163:15-164:2, Ex II, REINHART0009556 Ex. DD (a more legible copy of the Deed of Trust).) (ECF Nos. 126, 126-35, 126-30.) The Deed of Trust was a new version that addressed the concern Handzlik had raised regarding Anneli's signature. Fleming informed Handzlik that he had arranged for the original of the Deed of Trust to be sent to Handzlik and asked him to "put this in place" when he received it. (*Id*., Ex. II.) Fleming wrote that they would need to "continue to examine the issues" surrounding the Deed of Trust. (*Id.*, Ex. II.) The Deed of Trust was accompanied by the Note Secured by Deed of Trust, both of which were signed by Freer and Anneli. The debt amount referenced in these documents had changed from $2 million to $1 million.

On January 19, 2007, Handzlik sent an email to Fleming stating that he had

---

[9]There was a factual dispute between Chicago Title and Reinhart regarding the Deed of Trust that Reinhart reviewed. (Reinhart Resp. Chicago Title PFOF and Reinhart's SAF, ¶ 24.) They also disputed whether or not the Deed of Trust secured the Blowfish loan. (Chicago Title Resp. Reinhart SMF ¶ 42.) As previously noted, construction of the Deed of Trust is a question of law for the Court.

reviewed the Note Secured by Deed of Trust and the Deed of Trust that Fleming had sent him the previous day. Handzlik stated that the two documents were based on standard forms of First American Title Insurance Company.

Between January 17, 2007, and February 22, 2007, Mohamed transferred $1 million via six wire transfers to a Blowfish bank account.

| Date of Wire Transfer | Amount of Wire Transfer (Excluding Commission) |
|---|---|
| January 17, 2007 | $200,000 |
| January 25, 2007 | $150,000 |
| January 30, 2007 | $150,000 |
| February 5, 2007 | $55,000 |
| February 9, 2007 | $245,000 |
| February 22, 2007 | $200,000 |

Mohamed did not transfer or pay any money directly to Freer or Anneli at any time, and he never funded a personal loan to the Freers evidenced by the Deed of Trust.

On January 22, 2007, Reinhart hand delivered a Deed of Trust to Chicago Title and requested that Chicago Title record it with the appropriate authorities in California.[10] Reinhart included a cover letter requesting that Chicago Title have the document recorded as soon as possible and pay the recording fee, which Reinhart would later reimburse, and have the recording done by the agent who prepared the title commitment so it could be added to the updated commitment. (De Zur's letter transmitting the Deed of Trust to Buscher-Tuttle is dated January 22, 2006, but the

---

[10]Chicago Title and Reinhart disputed whether there was a written contract between them to record the Deed of Trust. (Reinhart Resp. Chicago Title PFOF and Reinhart's SAF, ¶ 30.) They also disputed whether Reinhart followed up with Chicago Title to confirm the recording. (*Id*. at ¶ 33.)

year is a typographical error and should have been "2007."

Three previous encumbrances securing debts had been recorded against the Freers' California residence: (1) the $3.43 million Northern Trust Bank mortgage; (2) the $501,000 law firm mortgage and (3) a third deed of trust securing a debt of $192,000 (the "Bryan mortgage").

On January 22, 2007, Buscher-Tuttle sent an email to DeZur attaching a document entitled "Commitment for Title Insurance," regarding the Freers' California home. This is a document showing liens and other encumbrances that is prepared before a title company issues a policy of title insurance on the piece of property.

The next day, January 23, 2007, DeZur followed up with Buscher-Tuttle by email asking her to confirm that she had received a Deed of Trust and that she had ordered an updated commitment in light of the recent recording of a third mortgage on the Freer property. Buscher-Tuttle responded by email six minutes later confirming that she had received the Deed of Trust, would have an update prepared, and would forward confirmation of the recording to Reinhart after it was accomplished.

Later on January 23, Buscher-Tuttle sent another email to DeZur attaching a copy of the Bryan mortgage which had been recorded on January 5, 2007, and asking DeZur if Chicago Title could still record the Deed of Trust. DeZur responded to Buscher-Tuttle's email approximately 30 minutes later as follows: "Yes, please record the Deed of Trust I sent to you." (Kennedy Aff., Ex. J, 162:11-163:5; Ex. OO.) (ECF No. 126-41.)

- 17 -

Buscher-Tuttle sent the Deed of Trust to McKinnon at Chicago Title's Los Angeles office on January 23, 2007, via Federal Express Priority Overnight. The notarial acknowledgement in the lower left corner of the Deed of Trust was not completely filled out — it was missing the names of Freer and Anneli.

On January 25, 2007, Buscher-Tuttle sent an email to DeZur informing her that the Los Angeles office would be returning the Deed of Trust to Buscher-Tuttle because of missing information in the notarial acknowledgement. However, this did not happen. Instead, on January 29, 2007, Buscher-Tuttle and DeZur had an exchange of emails in which Buscher-Tuttle informed DeZur that the Los Angeles office would be fixing the defect, that she had instructed Chicago Title's Los Angeles office to record the Short Form Deed of Trust, and that Buscher-Tuttle would inform DeZur of any problems. DeZur endorsed this solution. Aside from Buscher-Tuttle's January 29 email, DeZur has no recollection of being contacted by Buscher-Tuttle about any problem with the Deed of Trust.

In June 2007, the Freers entered into a contract to sell their California home, and the sale closed on August 10, 2007. The home was sold for $5.46 million. The sale proceeds were used to pay off, among other things, the three mortgages that were recorded against the property as of January 5, 2007 — the Northern Trust mortgage, the Law Firm mortgage, and the Bryan mortgage. Proceeds from the sale were deducted as part of the closing to pay off preexisting debts.

In addition $258,351.46 from the sale of the home went to Freer. Goldrush,

- 18 -

Ltd., a limited liability company organized by Freer, received $500,000 of the sale proceeds to secure an indebtedness arising after the Freers entered into a contract to sell their residence. Blue Chip Movers was paid $24,000 of the sale proceeds, and Beverly Loan Company was paid $100,306.

On August 23, 2007, Reinhart informed Mohamed, through Fleming, that no security instrument securing the Blowfish loan had been recorded on the Freers' California home. By letter dated August 29, 2007, Reinhart, on behalf of Mohamed, referred to Chicago Title's failure to record the Deed of Trust and requested that Chicago Title "make [Mohamed] whole with regard to the transaction." (Horne Decl., Ex. Z.) (ECF No. 124-26.)

Chicago Title had not fixed or recorded the Deed of Trust. Instead, it remained in Chicago Title's Los Angeles office until either March or April 2007, when the file containing it was sent to a storage location for closed files. When later found in Chicago Title's storage, the Deed of Trust had a note attached from Buscher-Tuttle to McKinnon that referenced a January 23, 2007, email between her and Chuck Hoffman, a senior title officer in the Los Angeles office.

Huddleston, McKinnon, and Huddleston's administrative assistant agree that having an original, unrecorded deed of trust in closed files storage was not appropriate. Despite a discovery request from Reinhart for emails received or sent by Buscher-Tuttle, McKinnon and any other person at Chicago Title involved in any efforts to fix the notarial acknowledgement or record the Deed of Trust, Chicago Title

- 19 -

did not produce the email referenced in Buscher-Tuttle's note. However, as a matter of policy, Chicago Title does not retain copies of electronic correspondence dating back to 2007 and Chicago Title's paper file for the assignment did not contain any printed e-mail communications from January 2007.

On September 1, 2010, Mohamed commenced this action against Reinhart and Chicago Title to recover damages in connection with the Blowfish loan. Mohamed did not sue Freer. Freer admits he owes Mohamed $1 million based upon his personal guarantee of the business loan to Blowfish. Freer has not repaid any of the principal or interest due under the loan.

According to multiple employees in Chicago Title's Los Angeles office, the absence of the Freers' names in the notarial acknowledgment meant that the Deed of Trust would not be accepted for recording by the Los Angeles County Recorder. [11] It would have been "very easy" for Chicago Title's Los Angeles office to locate Daniels' contact information through its computer database of notaries, but in 2007 Chicago Title did not contact her regarding the Deed of Trust. If Chicago Title had contacted her, Daniels would have been willing to assist Chicago Title to ensure that the document was recordable.

Chicago Title had no involvement in negotiating or drafting the Note Secured

---

[11]There was a factual dispute between Reinhart and Chicago Title regarding whether options to correct such defect in the Deed of Trust were available to Chicago Title. (*See* Chicago Title Resp. Reinhart SMF ¶ 63.) To the extent options for fixing the defect in the Short Form Deed of Trust were available, Chicago Title asserted that its policies prevented its personnel from fixing the defect.

- 20 -

by Deed of Trust, the Deed of Trust, the Blowfish Note, or any other loan documents related to this lawsuit. Mohamed did not purchase a policy of title insurance from Chicago Title with respect to the Blowfish loan.

In March 2013, Reinhart and Mohamed entered into a Covenant Not to Sue and Assignment ("Covenant and Assignment"), pursuant to which Mohamed assigned to Reinhart his claims against Chicago Title, Freer and others, including but not limited to claims arising out of any losses he sustained in connection with the loan that is the subject of this lawsuit. In conjunction with that assignment Reinhart paid $800,000 to Mohamed.

The Covenant and Assignment states:

> This document is not a release of Reinhart with respect to the claims asserted against the Reinhart Parties in the Lawsuit, but rather is a covenant not to sue the Reinhart Parties with respect to the claims described above. Mohamed further does not release Chicago Title, Freer or any other person with respect to any claim related to or arising out of the allegations set forth in the Lawsuit, except that Mohamed acknowledges that his receipt of the Settlement Payment discharges Freer's obligations with respect to the Loan to the extent of the amount of the Settlement Payment.
>
> . . .
>
> Mohamed, for and on behalf of himself and his heirs, successors and assigns, hereby agrees to assign and transfer to Reinhart any and all claims, causes of action, rights, and interests of whatsoever kind or nature that he has or may have against Chicago Title, Freer, and any other person or entity arising out of any loss, injury, or damage sustained by him in connection with the allegations set forth in the Lawsuit or in connection with

- 21 -

any and all documents referenced in or attached to the
Complaint filed in the Lawsuit (the "Assigned Claims")
Mohamed reserves any and all claims against Freer other
than the Assigned Claims.

. . .

The parties to the Agreement acknowledge and agree that
the Agreement is a compromise and resolution of disputed
claims, and neither the execution of the Agreement nor the
exchange of consideration required by the Agreement
shall be construed as an admission of any liability,
wrongdoing, or impropriety whatsoever by the parties.

(Kennedy Aff. Opp'n Freer Mot. Summary Judgment, Ex. A.) (ECF Nos. 147, 147-1.)

The Agreement states that "[t]his Agreement shall be construed, interpreted, and

governed by the law of the State of Wisconsin, without regard to the conflict of law

provisions of Wisconsin or any other jurisdiction."

## Analysis

The Court begins by addressing Freer's motion for summary judgment

dismissing Reinhart's third-party Complaint for indemnification and subrogation and

Chicago Title's cross-claims for indemnification, subrogation and contribution. (ECF

No. 116.)

### *Freer's Motion*

Freer maintains that the claims for indemnification, subrogation, and

contribution must be dismissed because Reinhart and Chicago Title cannot meet the

elements necessary to establish them. He maintains that Reinhart and Chicago Title

have conceded they are at fault, so they are not blameless tortfeasors who can shift

- 22 -

their entire burden. Further, he contends that they were not joint tortfeasors who acted with him.

The elements of a contribution claim are (1) joint causally negligent wrongdoers, (2) common liability because of such negligence to the same person, and (3) one bears more than his or her fair share of the burden. *Brown v. LaChance*, 165 Wis. 2d 52, 64, 477 N.W.2d 296, 303 (Wis. 1991) (citing *Giese v. Montgomery Ward*, 111 Wis.2d 392, 404, 331 N.W.2d 585, 591 (Wis. 1983)). At this juncture of the proceedings, Mohamed's negligence claim against Chicago Title has been settled. However, there has been no determination regarding Chicago Title's liability or non-liability for negligence as to the Deed of Trust. Construing the facts in the light most favorable to the non-movant (Chicago Title), Freer has not established any basis to dismiss Chicago Title's contribution claims against him.

Unlike contribution which involves jointly negligent wrongdoers, indemnity "shift[s] the loss from one person who has been compelled to pay to another who on the basis of equitable principles should bear the loss." *See Id.* (quoting *Kutner v. Moore*, 159 Wis.2d 120, 126, 464 N.W.2d 18, 20 (Wis. Ct. App. 1990)). "[A] right of indemnity has been said to exist whenever the relation between the parties is such that either in law or in equity there is an obligation on one party to indemnify the other, as where one person is exposed to liability by the wrongful act of another in which he does not join." *Kjellsen v. Stonecrest, Inc.,* 47 Wis.2d 8, 11-12, 176 N.W.2d 321, 323 (Wis. 1970). Equitable indemnification "shifts the entire loss from one person who

- 23 -

has been compelled to pay it to another who, on the basis of equitable principles, should bear the loss." *Estate of Kriefall v. Sizzler USA Franchise, Inc.,* 342 Wis. 2d 29, 54, 816 N.W.2d 853, 865 (Wis. 2012) (quoting *Swanigan v. State Farm Ins. Co.*, 99 Wis.2d 179, 196, 299 N.W.2d 234 (Wis. 1980)).

In opposing Freer's motion, Chicago Title maintains that its indemnification cross-claim against Freer is proper because Freer is contractually obligated to pay Mohamed $1 million. It further contends that Freer intentionally diverted money away from the sale of his home rather than paying Mohamed. (Chicago Title's Mem. Opp'n Freer Summ. J., 5-6.) (ECF No. 137.) With respect to its indemnification claim, Reinhart argues that Freer's failure to account for Mohamed's encumbrance at closing and his admitted failure to repay any portion of the principal and interest under the loan set this lawsuit in motion. (Reinhart Mem. Opp'n Freer Summ. J. , 3.)(ECF No. 145.)

Chicago Title's indemnification theory relies in part on a contractual right of indemnification. That theory is adequately plead in its cross-claim, which incorporates the allegation that the documents he signed obligated Freer to pay Mohamed. Additionally, both Chicago Title and Reinhart claim an equitable right to indemnification. The two basic elements of equitable indemnity are the payment of damages and lack of liability.

At this juncture, although Reinhart settled with Mohamed, there has been no determination as to Reinhart's liability to Mohamed. The Covenant and Assignment

- 24 -

explicitly states that it shall not be construed as an admission of any liability, wrongdoing, or impropriety whatsoever by the parties. Contrary to Freer's argument, Reinhart's argument is not indicative of any negligence on its part. (Freer's Reply Br. 3-4.) (ECF No. 153.)

The settlement between Reinhart and Chicago Title includes Mohamed's assigned claims against Chicago Title. However, there has not been any determination as to Chicago Title's liability to Mohamed on his breach of contract and negligence claims against them. Furthermore, although Reinhart and Chicago Title settled their claims against each other, there has been no determination regarding their respective liability for their claims against each other. Therefore, neither Reinhart nor Chicago Title are precluded from pursuing their claims for indemnification against Freer.

Subrogation is akin to indemnification in that it seeks to recoup the total payment that the party seeking subrogation has made. *Estate of Kriefal*, 816 N.W.2d at 865. "Subrogation rights may arise in three ways: (1) contractual subrogation, *Millers National Insurance Co. v. City of Milwaukee,* 184 Wis.2d 155, 167, 516 N.W.2d 376 (Wis. 1994); (2) statutory subrogation, *Ellsworth v. Schelbrock,* 235 Wis.2d 678, 611 N.W.2d 764 (Wis. 2000); and (3) equitable subrogation, *Berna-Mork v. Jones,* 174 Wis.2d 645, 652–53, 498 N.W.2d 221 (Wis. 1993)." *Estate of Kriefal,* 816 N.W.2d at 865. "Upon payment, the person who made the payment stands in the shoes of the person for whom payment was made." *Id.* at 871 (citing *Orlowski v.*

- 25 -

*State Farm Mut. Auto. Ins. Co.,* 339 Wis.2d 1, 810 N.W.2d 775 (Wis. 2012)). Both indemnification and subrogation require that a person seeking to recover has made payment. *Id.*

At this juncture, Reinhart has paid money through its settlement with Mohamed. However, the $800,000 Reinhart paid Mohamed represented a significant portion of the money that he loaned to Blowfish. Under the terms of the Agreement Freer was to receive $500,000 to repay the loan he had made to Blowfish. Freer also defaulted on his personal guarantee of the $1 million loan. Freer has not established a basis for summary judgment dismissing Reinhart's third-party claim for subrogation.

With respect to Chicago Title's subrogation claim, although Mohamed's claims against it for negligence and breach of contract have been settled, there has been no finding as to Chicago Title's liability for those claims. There has also been no determination of liability with respect to Reinhart and Chicago Title's cross-claims against each other. Therefore, Freer's motion for summary judgment dismissing Reinhart's third-party claims and Chicago Title's cross-claims against him is denied.

### Chicago Title's Motion

By its motion for summary judgment, Chicago Title seeks partial summary judgment finding that it is entitled to indemnity from Freer for any amounts that it may be found liable for in this action. (ECF No 120.) Chicago Title requests partial summary judgment against Freer holding that he would be liable for any damages for which Chicago Title is found liable. Freer counters that the personal guarantee he

- 26 -

provided to Mohamed does not obligate him to pay because Chicago Title is not a party to that guarantee and it has not made a claim against Freer based on it. Freer also argues that Chicago Title is not blameless and, therefore, may not obtain indemnification. Chicago Title responds that its indemnification cross-claim is proper because Freer is contractually obligated to pay Mohamed $1 million, and if he had paid his debt the events giving rise to Mohamed's claims against Chicago Title and Reinhart would be immaterial.

Of the proceeds from the sale of the California residence, Freer received $258,351.46; Goldrush, Ltd., a limited liability company organized by Freer, received $500,000; $24,000 was paid to Blue Chip Movers; and $100,306 went to Beverly Loan Company. Thus, directly or indirectly, Freer received over $882,000 from the sale of the residence, which Chicago Title states should have gone to Mohamed. Chicago Title asserts that as the allegedly negligent party, it is entitled to indemnity from the intentional wrongdoer.

At this juncture of the proceedings, Mohamed's claims for negligence and breach of contract have been settled. Chicago Title's assertion that Freer is liable to indemnify depends on factual issues that have not been resolved.

Based on the foregoing, Chicago Title's motion for summary judgment is moot, and its alternative partial summary judgment against Freer is denied.

*Reinhart's Partial Summary Judgment Motion*

Reinhart's motion for partial summary judgment with respect to its third-party claims for equitable indemnification and equitable subrogation against Freer, remains viable. (ECF No. 122.) With respect to Freer, Reinhart contends that the admitted failure of Freer, a former officer of Blowfish and guarantor of the Blowfish loan, to repay the principal and interest due under that loan is the root cause of this lawsuit. Regardless, the issues remaining for resolution in this action preclude a summary judgment ruling on liability in favor of Reinhart on its third-party claims for equitable indemnification and equitable subrogation against Freer.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Freer's motion for summary judgment (ECF No. 116) is **DENIED**;

Chicago Title's motion for summary judgment (ECF No. 120) with respect to the assigned claims of Mohamed and Reinhart cross-claims is **DISMISSED** and with respect to its cross-claims against Freer is **DENIED**;

Reinhart's motion for partial summary judgment (ECF No. 122) with respect to Chicago Title's cross-claims is **DISMISSED** and with respect to its third-party claims against Freer is **DENIED**;

The telephonic final pretrial conference will be initiated by the Court **at 9:30 a.m.** (changed from 10:00 a.m.) **on June 28, 2013**;

Any motions in limine must be filed **by July 3, 2013**;

- 28 -

Any responses to those motions must be filed **by July 10, 2013**;

Any replies must be filed **by July 15, 2013**;

Dated at Milwaukee, Wisconsin, this 26th day of June, 2013.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**